## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## LEXINGTON DIVISION

IN RE:

**WILLIAM AND GEORGIA LOCKRIDGE**                              **CASE NO. 11-50922**

**DEBTORS**


**FARMERS NATIONAL BANK OF**                                              **PLAINTIFF**
**CYNTHIANA**

**V.**                                                        **ADV. CASE NO. 11-5041**

**WILLIAM AND GEORGIA LOCKRIDGE**                              **DEFENDANTS**


### MEMORANDUM OPINION

The issues before the Court are (1) whether the Chapter 7 bankruptcy of the Debtors William and Georgia Lockridge should be dismissed for cause pursuant to 11 U.S.C. §707(a) and (2) if the Debtors' Chapter 7 bankruptcy is not dismissed, whether the unsecured debt of $1,834,284.98 owed by the Debtors to the Plaintiff Farmers National Bank of Cynthiana is nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and/or (B). The Court conducted a combined evidentiary hearing and trial on these issues on February 28, 2012. Upon consideration of the parties' stipulation of facts, testimony and exhibits admitted into evidence, the record, and the arguments of the counsel, the Court finds insufficient evidence to support a dismissal of the Debtors' case for cause pursuant to §707(a). The Court also finds that the Plaintiff has failed to meet its burden of proof under §523(a)(2)(A) and (B) and the debt at issue is dischargeable.

### Facts

This litigation arises out of a loan between the Plaintiff Creditor Farmers National Bank of Cynthia (the "Bank") and the Debtor Defendants Dr. William Walker Lockridge and Georgia Doherty Lockridge (collectively the "Debtors"). Dr. Lockridge, a self-employed real estate and

1

equine broker, is the sole member and owner of Aiken Road Acquisition, LLC.  He formed Aiken Road Acquisition, LLC for the exclusive purpose of purchasing a 167.946-acre farm located on Aiken Road, Versailles, Kentucky (the "Aiken Road Farm").   On January 22, 2008, Aiken Road Acquisition, LLC entered into an agreement to purchase the Aiken Road Farm for $3,107,001.00.  Dr. Lockridge planned on converting the Aiken Road Farm into a horse farm as he had done successfully many times in the past.

Four months later, on April 8, 2008, Dr. Lockridge signed a Loan Agreement with the Bank on behalf of Aiken Road Acquisition, LLC to borrow $3,360,000.00 from the Bank to finance the purchase (the "Loan").  Pursuant to the terms of the Note, Aiken Road Acquisition, LLC agreed to make monthly interest payments of $21,000.00 and semi-annual payments of principal, the first due in the amount of $75,000.00 on November 15, 2008.  The Note also required Aiken Road Acquisition, LLC, and any guarantors, to notify the Bank in writing within one business day "if any representation or warranty made herein, or in any related instrument, shall, for any reason, not be or shall cease, in any material respect to be, true and complete, and not misleading."  Any modifications to the Note were required to be in writing.

Dr. Lockridge, and his wife, Georgia Doherty Lockridge, personally guaranteed the Note at the Bank's request.  The Note was secured by not only a Mortgage on the Aiken Road Farm, but also an Assignment of Leases and Rents as well as a lien on Dr. Lockridge's fifty percent interest in four thoroughbred horses.

The Debtors financed the Loan through the Bank after Randy Reynolds, a former Vice President of the Bank, approached Dr. Lockridge at the behest of James Brown, owner, President and CEO of the Bank, and Mr. Robert Lake, a member of the Board of Directors, real estate appraiser, and acquaintance of Dr. Lockridge who knew Dr. Lockridge was looking for financing for the Aiken Road Farm.  Mr. Brown and the Board of Directors believed that the Aiken Road Farm was prime property for the development of a horse farm, particularly in the

2

hands of Dr. Lockridge, whose prior experience and reputation in building successful horse

farms in the Central Kentucky area made him a person with whom the Bank, and Mr. Brown in

particular, would like to cultivate a relationship.  Mr. Lake knew that Dr. Lockridge had recently

been offered approximately $5 million from a potential buyer interested in purchasing the Aiken

Road Farm from him.  Dr. Ed Ford, then Vice Chairman of the Bank's Board, with similar

education, background and interest in the horse business as Dr. Lockridge, made a point to

meet with Dr. Lockridge and advise him of the Bank's and Mr. Brown's interest in handling the

financing of the Aiken Road Farm.  The Bank and Mr. Brown clearly wanted and aggressively

pursued Dr. Lockridge's business.

Upon Dr. Lockridge's agreement to finance the purchase of the Aiken Road Farm with

the Bank, Mr. Reynolds reviewed several documents before submitting the Loan for approval by

the Senior Loan Committee pursuant to the Bank's standard loan underwriting process.  These

documents included:

> (1)  a personal financial statement submitted by the Debtors (the "2008 Financial Statement")[1];
>
> (2)  an Aiken Road Acquisition, LLC Business Plan representing that proceeds from the sale of ranch properties in New Mexico, owned in part by Mrs. Lockridge with an estimated value of $6,000,000.00, would be infused into the Aiken Road Farm in either principal payments or construction costs;
>
> (3)  a Lockridge Land Company Business and Financial Plan;
>
> (4)  Dr. Lockridge's resume; and
>
> (5)  an appraisal of Dr. Lockridge's fifty percent ownership interest in thoroughbred horses valued at $500,000.00.

---

[1] Although the evidence supports that a personal financial statement was submitted by the Debtors to the Bank in 2008, neither the Bank nor the Debtors have been able to produce it.

In addition to these materials, Mr. Reynolds reviewed an appraisal obtained by the Bank on
April 4, 2008 appraising the value of the Aiken Road Farm at $3,150,000.00, as well as the
Debtors' credit report.

As part of his due diligence, Mr. Reynolds asked Mrs. Lockridge to verify her interest in
the ranch property in New Mexico mentioned in the Aiken Road Acquisition, LLC Business Plan.
Mrs. Lockridge's interest in this ranch property is two-fold – she owns an interest in the
company that operates what is known as the Emery Gap Ranch as well as real estate that is
considered part of the Ranch. Mrs. Lockridge's interest in the John J. Doherty & Sons Cattle
Company, Inc. (the "Cattle Company") is a 24.9% interest in a closely-held family corporation
that owns 9,087.38-acres of New Mexico ranch land in fee simple and 3,636-acres of state
leased land. At the time the Debtors entered into the Loan with the Bank, the Cattle Company
was an active operation; now, the cattle owned by the Cattle Company have been sold and the
land is leased to an outside party for cattle grazing and, from time to time, used as hunting
grounds. The Cattle Company currently makes only enough money to pay bills and taxes.

Mrs. Lockridge also owns a one-third interest in fee simple in two tracts of land that are
considered part of the ranch property: (1) a 200-acre tract with a 60-year-old ranch house, a 75-
year-old cinder-block barn, and corrals/pens adjoining the barn, all in need of repair (collectively
the "Ranch Headquarters"); and (2) a separate, noncontiguous 460-acre tract of land located in
the mountains of New Mexico, with no water, fences, or mineral rights, and accessible only by
horseback or heavy-duty four-wheel drive machinery during good weather conditions. Mrs.
Lockridge shares ownership of these two tracts of land with her two sisters. The land owned by
the Cattle Company, the Ranch Headquarters, and the separate 460-acre tract of undeveloped
land are collectively referred to herein as the "New Mexico Ranch."

In her discussions with Mr. Reynolds during the loan underwriting process, Mrs.
Lockridge explained to him that her family was interested in selling the New Mexico Ranch as

4

part of a 1031 Exchange for the property, which would result in proceeds that could be used to

pay off the Loan early.  This decision to sell the New Mexico Ranch was not formally made

though until June 2008, after the death of Mrs. Lockridge's mother, at which point the New

Mexico Ranch was listed at the initial offering price of $15,500,000.00 for approximately 8,300-

acres of deeded land and 3,300-acres of state leased land.[2]  At no time did either Mrs.

Lockridge or Mr. Reynolds consider the New Mexico Ranch as collateral to secure the Loan, as

both believed the value of the Aiken Road Farm, as well as Dr. Lockridge's earnings, were

sufficient to satisfy the Loan.

Mr. Reynolds asked Mrs. Lockridge to provide some form of documentation related to

the New Mexico Ranch to determine its value.  Mrs. Lockridge provided:

> (1)  a letter dated February 22, 2008, by a licensed appraiser and ranch broker, James Clevenger, stating that the New Mexico Ranch is worth $1,500.00 to $2,000.00 per acre;
>
> (2)  a list prepared by Mrs. Lockridge based on her own Internet research of ranches for sale or ranches that had been recently sold in neighboring areas with a sale price of approximately $2,000.00 to $6,800.00 per acre; and
>
> (3)  a list of the Cattle Company assets, prepared by Mrs. Lockridge based on information obtained from the Cattle Company and the estimated value of the New Mexico Ranch per acre by Mr. Clevenger as of March 2008, indicating the value of the Cattle Company as $22,107,384.00 to $24,563,760.00 and the value of Mrs. Lockridge's interest as $5,164,325.00 to $5,709,641.00.

In addition to collecting this information from Mrs. Lockridge, Mr. Reynolds also spoke to Mr.

Clevenger on one or two occasions to verify the information provided in his letter, although he

did not discuss in detail with Mr. Clevenger the value of the New Mexico Ranch.

Mr. Reynolds summarized the documents collected from the Debtors and his own

investigation into an Offering Sheet dated April 7, 2008.  In the Offering Sheet, Mr. Reynolds

---

[2] The Slaughter House and Burridge Pastures, explained more fully *infra*, were not included in the property marketed for sale.

pointed out that the Aiken Road Farm's value of $3,150,000.00, when compared to the amount of the loan at $3,360,000.00, did not meet the Bank's required eighty percent loan-to-value ratio for commercial loans, but that an exception to the policy in the amount of $260,000.00 would be made, despite no money down by Aiken Road Acquisition, LLC or the Debtors.  He further listed three sources of repayment for the Loan: (1) income; (2) the Aiken Road Farm; and (3) proceeds from the sale of the New Mexico Ranch, projected at $6,000,000.00.  Income was listed as a primary source, the Aiken Road Farm a secondary source, and the New Mexico Ranch as a third potential source.  Finally, Mr. Reynolds also set forth within the Offering Sheet five strengths in favor of the Loan, including: (1) the net worth of the borrower; (2) the borrower's expertise in farm conversion and strong ties to the horse community; and (3) the projected cash flow.

The Offering Sheet was presented to the Senior Loan Committee, consisting of Mr. Brown, Mr. Reynolds and Gary Taylor, for approval of the Loan.  Upon presenting the Loan to the Senior Loan Committee, Mr. Reynolds recommended approval of the Loan based on (1) Dr. Lockridge's character and reputation in building premium thoroughbred horse farms; (2) the collateral value of the Aiken Road Farm; (3) Dr. Lockridge's ability to generate cash flow and income; and (4) the Debtors' credit report.  Gary Taylor testified that the Debtors' personal net worth, including the value of the New Mexico Ranch, played a key role in his approval of the Loan as well.

The Senior Loan Committee ultimately approved the Loan in the amount of $3,360,000.00 as an exception to the Bank's loan-to-value ratio policy.  The only collateral available to satisfy this excess absent the Aiken Road Farm were (1) Dr. Lockridge's fifty percent interest in certain thoroughbred horses and (2) a $200,000.00 portion of the Loan

proceeds that were placed into a certificate of deposit ("CD") of which the Bank took possession and treated as collateral against the Loan.[3]

Furthermore, although all three members of the Senior Loan Committee, and ultimately the Bank's Board of Directors, approved the Loan, Mr. Reynold's, Mr. Taylor's, and the Board's assent were merely a formality. Mr. Brown, as owner of the Bank, pursued and wanted to make the Loan. As Mr. Reynolds testified, Mr. Brown made the final call and once Mr. Brown approved the Loan, "there was no question about the loan being made." The Loan therefore closed the day after it was approved, or April 8, 2008.

Ten days after the Loan closed, Mrs. Lockridge's mother, Georgia Ruth Doherty, died. Mrs. Lockridge's mother was preceded in death by her father, William O. Doherty, who died on July 18, 2007. Probate for the estates for Mr. and Mrs. Doherty were opened and administered by Mrs. Lockridge's brother, William Doherty, and sister, Mary Margaret Wright, in Union County, New Mexico (collectively the "Estates"). On October 27, 2008, the Estates hired Sam Middleton, an appraiser in New Mexico, to appraise the New Mexico Ranch for tax purposes with an appraised value as of April 18, 2008. Mr. Middleton appraised the New Mexico Ranch, including certain state leased property, at an estimated fair market value of $6,815,000.00 (the "Middleton Appraisal"), substantially less than what the Debtors represented to the Bank.

On December 11, 2008, Inventory and Appraisal Reports based on the Middleton Appraisal was filed in the New Mexico District Court. The Inventory and Appraisal Reports also disclosed the New Mexico Ranch to be worth substantially less than disclosed by the Debtors to the Bank. Neither a copy of the Middleton Appraisal nor the Inventory and Appraisal Reports were provided to the Bank or the Debtors until the bankruptcy, and subsequently this litigation, ensued. Mrs. Lockridge was aware the Middleton Appraisal was performed for estate purposes

---

[3] The CD was later cashed in June 2009 and applied towards the principal and interest owed on the Loan.

and that the numbers were lower than expected, but she was not given the exact numbers and did not think that it would affect the asking price of $15,500,000.00 for the New Mexico Ranch.

On September 1, 2009, the Cattle Company entered into a Stock Redemption and Exchange Agreement with Horseshoe Ranch, LLC, an entity owned in part by Mrs. Lockridge's nephews, and the John James Doherty Testamentary Trust, a trust created by Mrs. Lockridge's late brother on behalf of her nephews (the "Trust").  The Trust owns shares in the Cattle Company.  Horseshoe Ranch, LLC owns a parcel of land in the middle of Emery Gap Ranch. The Cattle Company owns approximately 1,900-acres of land that adjoins the Horseshoe Ranch, known as the Slaughter House and Burridge Pastures (collectively the "Pastures"), both of which were used by Mrs. Lockridge's nephews for grazing purposes.

As part of the negotiations to gain approval from all shareholders to sell the New Mexico Ranch, Mrs. Lockridge's nephews, as owners of Horseshoe Ranch, LLC, and beneficiaries of the Trust, agreed to vote for the sale of the New Mexico Ranch if the other Cattle Company shareholders would agree to a trade of the nephews' shares in the Cattle Company and the parcel of land they owned in the middle of the Cattle Company for the land that joins Horseshoe Ranch.  The Trust and Horseshoe Ranch, LLC wanted to obtain the land joining them to provide for winter protection for cattle, as well hunting and fishing grounds.  The Cattle Company needed the parcel in the middle of the Ranch and the nephews' shares in the Cattle Company. To effectuate the bargain for the least amount of cash consideration possible, the parties all agreed to use lesser valuations for the property than used for the asking price of the Ranch, or $583,500.00 for the Pastures and $837,626.00 for the Cattle Company shares.  Again, the values assigned to these parcels of land that make up the New Mexico Ranch were substantially less than represented to the Bank.  The parties to the Stock Redemption and Exchange Agreement operate as if the trade has already occurred, although no money or documentation has exchanged hands.

In December 2008, the Bank's President and CEO, Mr. Brown, suffered a stroke and was declared legally incompetent.  Mr. Reynolds, as Executive Vice President, assumed Mr. Brown's duties until Mr. Brown's wife took over three to four months later.  It was not until a year later, in January 2010, that the Bank hired Terry Emrick to replace Mr. Brown as President and CEO.  At the same time, Jay Slaton, hired on for consulting purposes in June 2009 and a member of the Bank only since July 2009, became Chairman of the Board.

Just prior to Mr. Brown's stroke, Aiken Road Acquisition, LLC missed the required semi-annual payment of principal due on November 15, 2008.  In February 2009, following Mr. Brown's stroke and during this period of upheaval in the Bank's senior management, Dr. Lockridge approached Mr. Reynolds about the missed principal payment.  Mr. Reynolds proposed modifying the Loan to better fit the Debtors' cash flow.  On February 25, 2009, the Bank, Aiken Road Acquisition, LLC, and the Debtors entered into a written Modification and Extension Agreement that modified the Loan to defer the principal payment due on November 15, 2008 to May 15, 2009, and place the monthly interest payments on a quarterly payment schedule.  No additional financial documents or information was requested by the Bank or delivered by the Debtors prior to the Modification and Extension Agreement.  The Debtors did not inform the Bank of the Middleton Appraisal, the Inventory and Appraisal Reports, or the Stock Redemption and Exchange Agreement either.

Aiken Road Acquisition, LLC again failed to make the May 15, 2009 principal payment. Dr. Lockridge then decided to sell the Aiken Road Farm to pay the debt owed to the Bank.  He received a written offer to purchase the Aiken Road Farm in August 2009 for $3,465,000.00, sufficient to pay the debt to the Bank.  After discussing the matter with Mr. Reynolds, who told him that the offer was his judgment call, Dr. Lockridge rejected the offer based on his belief that the property was worth more than what was offered.

Mr. Reynolds resigned from the Bank in August 2009.  The Loan was reassigned to Vice Presidents Betsy Haley and Billy Mullins, neither of whom had any prior relationship with Dr. Lockridge or any experience servicing the Loan prior to August 2009.  On August 20, 2009, Mr. Mullins met with Dr. Lockridge.  Dr. Lockridge informed him that he had received an offer to purchase the Aiken Road Farm that would be sufficient to pay the indebtedness owed to the Bank.  Dr. Lockridge did not present a written offer or purchase contract at the time because he had already rejected that offer following his discussions with Mr. Reynolds.

Aiken Road Acquisition, LLC and the Debtors again failed to make the payment that was due on September 1, 2009.  Except for a single payment towards the debt in the amount of $8,803.00 from the proceeds of a horse sale in August 2009, no payments on the Loan have been made since that time.

On September 24, 2009, after a review of the Loan file, which was missing not only the 2008 Financial Statement, but also updated financials and a complete loan analysis, the Debtors were asked to provide an updated financial statement ("2009 Personal Financial Statement").  The 2009 Personal Financial Statement submitted by the Debtors listed the New Mexico Ranch with a value of $20,000,000.00 and Mrs. Lockridge's one-third interest in the New Mexico Ranch as having a value of $6,000,000.00, or substantially the same values reported to the Bank in early 2008.  At the time, the Bank did not question the accuracy of the 2009 Personal Financial Statement.

Mrs. Haley and Mr. Mullins spoke with Dr. Lockridge several times about the Loan in the fall and early winter of 2009 in an attempt to bring the Loan current.  Dr. Lockridge represented to each of them on multiple occasions that the Loan would be brought current or paid off with: (1) proceeds from Dr. Lockridge's real estate brokerage commissions; (2) proceeds from the sale of the Aiken Road Farm; or (3) proceeds from the sale of the New Mexico Ranch.  At times,

he represented that an offer to purchase had been made or that the sale of a property was in its "last stage."  At no time did Dr. Lockridge provide documentation to support his statements.

During this time period, Dr. Lockridge had received interest from potential buyers in purchasing the Aiken Road Farm, but no formal offers were made except the August 2009 offer Dr. Lockridge rejected.  Similarly, although the New Mexico Ranch was heavily marketed for sale at the asking price of $15,500,000.00 in 2009 and generated interest from potential buyers, no serious offers were made or entertained. Regardless, the Bank believed Dr. Lockridge's representations that sales of the Aiken Road Farm and/or the New Mexico Ranch were forthcoming and gave Dr. Lockridge additional time to bring his promises to fruition.

By December 2009, the Bank's patience was running thin.  Mrs. Haley and Mr. Mullins visited the Aiken Road Farm that same month to inspect the property and discuss with Dr. Lockridge his plans for repayment of the Loan.  During this meeting Dr. Lockridge represented the New Mexico Ranch was in the process of being sold and the proceeds from Mrs. Lockridge's share of the sale, in the approximate amount of $5,000,000.00 to $6,000,000.00, would be used to pay off the Loan.  Dr. Lockridge also later informed them that a buyer was interested in purchasing the Aiken Road Farm and gave the Bank permission to disclose the payoff amount of the Loan to the potential buyer.  Despite these representations, Mrs. Haley was directed to send a letter to the Debtors advising them of the past due status of the Note and requesting payment be brought current.

On December 16, 2009, the Bank made its first written demand for payment.  In the letter, the Bank informed the Debtors that the Loan was past due and that the Bank was not in a position to stop collection efforts, but that it would agree to forbear if a signed purchase contract was presented to the Bank by December 31, 2009, providing for a purchase price for the Aiken Road Farm in an amount no less than the January 10, 2010, payoff amount, plus any costs of sale, with the closing to take place on or before January 10, 2010.  The Bank also asked for a

Memorandum of Understanding regarding the sale by December 22, 2009.  Subsequently, the

deadline was extended to January 8, 2011, based on Dr. Lockridge's continued representations

that a buyer was interested in purchasing the Farm.  But no documentation of the potential sale

was forthcoming.

On February 22, 2010, Mrs. Haley, Mr. Mullins, and Mr. Emrick, the Bank's new

President and CEO, met with Dr. Lockridge.  Dr. Lockridge assured them that substantial real

estate commissions would be received within the next thirty days sufficient to bring the Loan

current but again, no payments on the Loan were made.

On March 17, 2010, Mr. Emrick and Mrs. Haley met with Dr. Lockridge at the Bank.  The

purpose of the meeting was to determine a plan of action to bring the Loan current but no

agreement was reached.  The Bank instructed its counsel to proceed with foreclosure and on

March 17, 2010, counsel for the Bank wrote to the Debtors notifying them that all sums pursuant

to the Note were due by April 1, 2010, or the Bank would file a foreclosure complaint.

Also in March 2010, the Bank began to research the value of the New Mexico Ranch in

earnest as a potential source of repayment.  On March 22, 2010, the Bank performed Internet

research on the Emery Gap Ranch.  On March 25, 2010, the Bank did further Internet research

on the Cattle Company.  When the Debtors responded to the Bank's demand letter and

attempted to negotiate a settlement, including a sale of the Aiken Road Farm for $2,700,000.00

based on a written offer that would require the deficiency balance to be forgiven by the Bank,

they were unsuccessful in getting the Bank's approval or the Bank's interest in further

negotiations because Bank refused to negotiate until the Debtors provided additional

information regarding the New Mexico Ranch.  The Debtors refused to provide the information

requested, as the Debtors, consistent with Mrs. Lockridge's intentions when the Loan was

made, did not want to pledge the New Mexico Ranch as collateral or put the Ranch at risk to

satisfy the Loan.

Throughout the parties' attempts to workout or restructure the Loan, the parties never entered into a formal forbearance agreement.  Neither the Bank's board minutes nor the Bank's loan committee minutes reflect any discussions of a forbearance agreement.  Rather, the Bank merely delayed taking any legal action to give Dr. Lockridge time to bring the Loan current while at the same time weighing their other options of foreclosure on the property, legal action against the Debtors as guarantors, and/or resolution of the debt by financing against the New Mexico Ranch or the sale of the same.

On July 20, 2010, the Bank finally filed a foreclosure proceeding in Woodford Circuit Court, ten months after the Debtors failure to pay the September 1, 2009 payment.  On October 4, 2010, the Woodford Circuit Court entered a Judgment and Order for Sale against Aiken Road Acquisition, LLC and the Debtors, jointly and severally, in the principal amount of $3,285,000.00.  The Aiken Road Farm was sold for $1,800,000.00.  The Bank now holds a deficiency judgment against the Debtors in the amount of $1,834,284.98.

On March 1, 2011, the Bank served deposition notices and *subpoenas duces tecum* on the Debtors for their asset depositions to take place on March 30, 2011.  On March 29, 2011, in an effort to stop the Bank's collection efforts, the Debtors filed for Chapter 7 bankruptcy.  Mark Miller was appointed the Chapter 7 Trustee.

On Schedules A and B of the Petition, the Debtors disclosed Mrs. Lockridge's interest in the New Mexico Ranch.  The Debtors assigned a value of $5,000.00 to the Ranch Headquarters and the 460-acre tract of undeveloped land owned in one-third fee simple by Mrs. Lockridge. The Debtors further assigned a value of $2,500.00 for Mrs. Lockridge's 24.9% ownership interest in the Cattle Company.  Attached to Schedules A and B were explanations of her interests as well as the Debtors' justification for the estimated values assigned to these assets.

The Debtors explained that the disrepair of the Ranch Headquarters, as well as the undeveloped and isolated nature of the 460-acre tract, and the inability to sell the Ranch land in

13

the current recession despite marketing it for over 2½ years, justified assigning a nominal value of $5,000.00.  The Debtors further explained that a minority interest in a family corporation subject to a Voting Trust Agreement in a non-performing asset justified assigning a nominal value of $2,500.00.

Mrs. Lockridge entered into a Voting Trust Agreement on August 10, 2010 at the request of her sisters and the Cattle Company's counsel.  As part of this agreement, Mrs. Lockridge agreed to deliver her 3,354.70 shares of voting common stock in the Cattle Company to her sisters, thereby giving her sisters her voting rights but retaining the dividends for her benefit.  On March 29, 2011, a day prior to filing bankruptcy, a Statement of Beneficial Interest was delivered to Mrs. Lockridge, indicating delivery of stock certificates to the appointed trustees in the Voting Trust Agreement.  The Voting Trust Agreement was later revoked on October 10, 2011, at the request of the United States Trustee in exchange for not objecting to the Debtors' discharge.

The Debtors listed the debt owed to the Bank on Schedule F and the Bank filed a proof of claim (Proof of Claim #3) for $1,834,284.98.  When compared to the Debtors' other liabilities listed in the petition, the debt owed to the Bank amounts to over 75% of the Debtors' overall debt.

The Debtors listed a total combined average monthly income of $12,955.00 on Schedule I and total monthly expenditures of $13,521.00 on Schedule J.  The Debtors explained that Dr. Lockridge's "thoroughbred deals" are contracted in the first six months of the year and paid out in the last six months.  Thus, according to the Debtors, the income figure on the petition covered the last four months of 2010, which represent Dr. Lockridge's highest gross income.  Taking these figures out the equation, the Debtors reported that their gross monthly income is closer to $4,015.67, as Dr. Lockridge has had no farm sales in the three years prior to the filing of the petition and his thoroughbred sales are off by sixty percent.

Finally, despite signing the 2009 Financial Statement, the Debtors inadvertently failed to disclose it on the Statement of Financial Affairs.

On June 24, 2011, the Bank simultaneously filed a Motion to Dismiss the Chapter 7 bankruptcy for cause pursuant to §707(a) and an adversary proceeding seeking a determination that the debt owed to it is nondischargeable pursuant to §523(a)(2)(A) and (B).  The Court ordered the Motion to Dismiss to be heard in an evidentiary hearing set on the same date and time as the trial in the adversary proceeding based on the overlap of evidence to be presented. The combined evidentiary hearing was conducted on February 28, 2012.  The matter is now ripe for determination.

### Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I) and (J).  Venue is proper pursuant to 28 U.S.C. §1409.

### Discussion

**A.    11 U.S.C. §707(a)**

The Bank has first moved to dismiss the Debtors' Chapter 7 bankruptcy for cause pursuant to 11 U.S.C. §707(a).  A court may dismiss a Chapter 7 bankruptcy after notice and hearing "for cause."  11 U.S.C. §707(a).  "For cause" includes filing a case in bad faith.  *See Indust. Ins. Serv's., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1126-27 (6th Cir. 1991).  A debtor's prepetition and postpetition conduct may be evaluated and prepetition conduct alone can provide sufficient grounds to dismiss.  *Michigan Nat'l Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 394 (6th Cir. 1992).

To determine whether a case should be dismissed for filing in bad faith the Court must examine the totality of the circumstances.  Fourteen factors may be considered in making this determination:

15

1. The debtor reduced his creditors to a single creditor in the months prior to filing the petition.

2. The debtor failed to make lifestyle adjustments or continued living an expensive or lavish lifestyle.

3. The debtor filed the case in response to a judgment, pending litigation, or collection action with intent to avoid a large single debt.

4. The debtor made no effort to repay his debts.

5. The unfairness of the use of Chapter 7.

6. The debtor has sufficient resource to pay his debts.

7. The debtor is paying debts to insiders.

8. The schedules inflate expenses to disguise financial well-being.

9. The debtor transferred assets.

10. The debtor is over-utilizing the protection of the Code to the unconscionable detriment of creditors.

11. The debtor employed a deliberate and persistent pattern of evading a single major creditor.

12. The debtor failed to make a candid and full disclosure.

13. The debts are modest in relation to assets and income.

14. There are multiple bankruptcy filings or other procedural "gymnastics."

*In re Emge*, 226 B.R. 396, 399-400 (Bankr. W.D. Ky. 1998) (citing *In re Spagnolia*, 199 B.R. 362 (Bankr. W.D. Ky. 1995).  Generally, the presence of only one of these factors is insufficient to support a §707(a) dismissal.  However, a combination of factors may warrant a dismissal.  *Id.*

Dismissal based on bad faith must be considered on an *ad hoc* basis.  "It should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle and an intention to avoid a large single debt based on a conduct akin to fraud, misconduct, or gross negligence."  *In re Zick*, 931 F.2d at 1129.

For the reasons explained more fully below, none of these factors are present here. This is the Debtors only bankruptcy filing.  The Debtors admittedly filed their Chapter 7 bankruptcy on the eve of their asset depositions to stop the Bank's collection efforts on a deficiency judgment against them, but only after a foreclosure proceeding that satisfied a large portion of the debt owed to the Bank.  The Debtors could have filed bankruptcy much earlier in an attempt to avoid the foreclosure proceeding, but did not.  Only after the Bank pursued the deficiency judgment were the Debtors forced to consider bankruptcy protection.

In so filing, the Debtors scheduled over $2.4 million in unsecured debt.  The Bank is not the Debtors' only creditor, but it is the Debtors' primary creditor, as its deficiency claim constitutes approximately 75% of the unsecured claims.  The remaining 25% of other unsecured debt is over $500,000.00.

This scenario, in and of itself, is not an uncommon scenario in bankruptcy.  The key to a dismissal for cause under §707(a), and what is missing here, is evidence of an abuse of the bankruptcy system.  There is no evidence of the Debtors' intent to defraud by concealing potential sources of income or attempting to avoid satisfying its obligation to the Bank.

Although the Debtors listed the New Mexico Ranch on the petition with a value far less than was represented to the Bank prior to the filing of the bankruptcy, the Court finds that the explanations offered by the Debtors as to the estimated values, both attached to the petition and as part of their testimony at trial, are credible and adequately explain the figures they chose in light of their valuation for the Chapter 7 Trustee.  There is no evidence in the record of their intent to conceal these assets or the true value of the assets.  Rather, the detailed explanations of the logic behind the estimated values show otherwise.

The Debtors were aware that the assets would be liquidated by the Trustee.  Mrs. Lockridge's minority interest in a closely-held family corporation that is no longer active has little value on the open market except to other members of the family, and there is evidence in the

record that the Trustee, recognizing this, is seeking a sale of these shares in this capacity.

Furthermore, although the New Mexico Ranch had been marketed since 2008 for sale for

$1,500.00 to $2,000.00 per acre, as represented to the Bank, no serious offers had been made

and interest in Mrs. Lockridge's share would most likely come from her family members.

Considering the nature of valuing the New Mexico Ranch for purposes of liquidation in a

Chapter 7 bankruptcy, as well as the nature of Mrs. Lockridge's interest in these assets, the

Court finds no nefarious intent by the Debtors in estimating these assets at a nominal value.

Moreover, based on Schedules I and J, the Debtors do not appear to live a lavish

lifestyle.  The $12,000 figure offered for the Debtors' gross monthly income is skewed based on

the nature of Dr. Lockridge's employment, as explained by the Debtors in the petition.

Furthermore, the Debtors' monthly liabilities, which include expenses for the care of their

granddaughter of whom they have custody, even compared to this skewed amount, shows a

loss of $526.00 per month.  There is no evidence that these expenses are inflated, nor is there

evidence that the Debtors are not making appropriate lifestyle adjustments.

The Court further finds that the failure to mention the 2009 Financial Statement in the

Statement of Financial Affairs was inadvertent and without fraudulent intent.  Mrs. Lockridge

testified that she had primary responsibility in working with counsel to prepare the petition.

According to Mrs. Lockridge, she did not have a copy of the 2009 Financial Statement and

simply forgot about it.  This is not unreasonable considering that Dr. Lockridge dealt exclusively

with the Bank prior to the filing of the bankruptcy and participated little in the preparation of the

petition.  There is no evidence of intent to conceal the existence of the 2009 Financial

Statement.

While the Voting Trust Agreement causes some concern because it, in effect,

transferred Mrs. Lockridge's interest in the Cattle Company to her two sisters, the evidence

shows that her intent was merely to give her sisters her voting rights for the continuity of the

18

Cattle Company and not to place this asset out of the reach of the Trustee.  Even so, when

asked to terminate the Voting Trust Agreement by the United States Trustee, Mrs. Lockridge did

so.

Finally, for the reasons explained more fully below, the Debtors' prepetition conduct

does not lead this Court to believe that the Debtors filed their Chapter 7 bankruptcy in bad faith.

Considering the totality of the circumstances and the fourteen factors set forth above, the Court

finds insufficient evidence to support a denial of the Debtors' Chapter 7 discharge pursuant to

§707(a).

**B.        11 U.S.C. §523(a)(2)(A) and (B)**

As an alternative to the Bank's Motion to Dismiss the Debtors' Chapter 7 bankruptcy, the

Bank also seeks a judgment declaring the debt nondischargeable pursuant to 11 U.S.C.

§523(a)(2)(A) and/or (B).  In doing so, the Bank does not argue the initial Loan to Aiken Road

Acquisition, LLC was procured by fraudulent misrepresentations about the value of Mrs.

Lockridge's interest in the New Mexico Ranch; rather, the Bank argues that the Debtors'

representations about Mrs. Lockridge's personal net worth as a guarantor on the Loan, including

her interest in the New Mexico Ranch, subsequent to the initial Loan process and throughout

the Loan relationship were material fraudulent misrepresentations upon which it relied to its

detriment.

According to the Bank, the Debtors' failure to disclose the substantially lower values

given to the New Mexico Ranch in the Middleton Appraisal, Inventory and Appraisal Reports,

and the Stock Redemption and Exchange Agreement as required by the terms of the Note is

tantamount to a materially false representation about the value of the New Mexico Ranch.  The

Bank argues that it relied on this materially false information in entering into the Modification and

Extension Agreement.  Furthermore, the Bank argues that it relied on the strength of Mrs.

Lockridge's net worth as represented on the 2009 Financial Statement, which falsely reflected

Mrs. Lockridge's interest in the New Mexico Ranch was worth $6,000,000.00, and false statements by Dr. Lockridge to the Bank's officers that payment was forthcoming from proceeds of the sale of the New Mexico Ranch, the Aiken Road Farm, or his real estate or equine commissions, in forbearing to take legal action against Aiken Road Acquisition, LLC, and the Debtors until July 2010.

In order for a debt to be nondischargeable under to 11 U.S.C. §523(a)(2), the Bank must show the Debtors made a material misrepresentation with an intent to defraud.  The Bank has first alleged that the debt herein is nondischargeable because it was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. §523(a)(2)(A).  To except a debt from discharge under §523(a)(2)(A), a creditor must prove:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representations; and (4) the creditor's reliance was the proximate cause of the loss.

*Rembert v. AT&T Univ's Card. Serv's., Inc. (In re Rember*t), 141 F.3d 277, 281 (6th Cir. 1998).

The Bank has also alleged that the debt is nondischargeable pursuant to §523(a)(2)(B). Under §523(a)(2)(B), a debt may be declared nondischargeable if four elements are met.  "First, the statement in writing must be materially false.  Second, it must be respecting the debtor's or an insider's financial condition.  Third, it must have been reasonably relied upon by the creditor. Fourth, it must have been caused to be made or published with the intent to deceive."  *Citizens Union Bank v. Hayden (In re Hayden)*, 395 B.R. 402, 405-406 (Bankr. W.D. Ky. 2008).

The Bank bears the burden of proof under §523(a)(2) by a preponderance of the evidence.  Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor.  *Kentucky Neighborhood Bank v. Ireland (In re Ireland),* 441 B.R. 572, 582 (Bankr. W.D.Ky. 2011).

Regardless of which provision the Bank relies on in seeking relief, the Bank must prove the Debtors intended to deceive the Bank.  A plaintiff proceeding under §523(a)(2)(A) must demonstrate that the debtor intended to deceive the plaintiff.  *See In re Rembert,* 141 F.3d at 281.  Likewise, a plaintiff proceeding under §523(a)(2)(B) must prove that the financial statement submitted was knowingly false or made with such gross recklessness as to its truth that a finding of fraud is warranted.  *See Bank One, Lexington, N.A. v. Woolum (In re Woolum)*, 979 F.2d 71, 73 (6th Cir. 1992);  *Hoffman & Kuhn, Inc. v. Branham (In re Branham)*, 126 B.R. 283, 290 (Bankr. S.D. Ohio 1991).  To determine whether the debtor acted with gross recklessness, the analysis must focus on whether the surrounding circumstances or the debtor's actions appear so inconsistent with the debtor's self-serving statement that he or she lacked intent that the proof leads the court to disbelieve the debtor.  *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 797 (Bankr. E.D. Tenn. 2003); *see also First Nat'l Bank of Centerville, Tenn. v. Sansom (In re Sansom)*, 224 B.R. 49, 57 n.11 (Bankr. M.D. Tenn. 1998) (defining gross recklessness "to mean flagrant, indicating mental attitude of the debtor that would be the evidentiary equivalent of intent to deceive.")

The Bank has failed to meet its burden.  Based on the evidence presented at trial, the Court finds that the Debtors explanations for their actions are credible, and there is no proof that the Debtors intended to deceive the Bank or that the Debtors acted with such gross recklessness to support a finding of fraud.  The Debtors' failure to disclose the value assigned to the New Mexico Ranch in the Middleton Appraisal and the Inventory and Appraisal Reports is not fraudulent based on the circumstances herein.  The Debtors credibly testified that they didn't know until preparing to file bankruptcy the true disparity between Mr. Middleton's appraisal and Mr. Clevenger's appraisal.   The Debtors were not involved in the probate of Mrs. Lockridge's parents' Estates.  Mrs. Lockridge testified that she knew the Middleton Appraisal was lower than expected, but she did not know the exact numbers.  Dr. Lockridge testified to the same.  Since

neither saw the Middleton Appraisal or the Inventory and Appraisal Reports for the Estates until the bankruptcy was filed, the Debtors had no reason to know the vast difference in value.

Moreover, Mrs. Lockridge further testified that to the extent she knew generally that the numbers were lower than what was represented to the Bank, she did not believe that any disparity as shown by these probate documents affected the value of the Ranch.  Mrs. Lockridge was told that the numbers would not affect the sale price of the Ranch of $15,000,000.00.  Mrs. Lockridge testified that the Middleton Appraisal and Inventory and Appraisal Reports were prepared for probate purposes.  Regardless of the value assigned to the New Mexico Ranch in these documents, she and the other shareholders continued to believe that the New Mexico Ranch was worth what she and Dr. Lockridge represented to the Bank.  In fact, the Ranch continued to be marketed based on Mr. Clevenger's figures.  Mrs. Lockridge clearly believed that the New Mexico Ranch, and her interest in the Ranch, was worth what she and Dr. Lockridge represented to the Bank, even after the Middleton Appraisal and filing the Inventory and Appraisal Reports.  Dr. Lockridge shared her belief.  However misguided this belief may have been, it was not fraudulent.

Mrs. Lockridge also credibly and adequately explained the purpose behind the Stock Redemption and Exchange Agreement and the reason for the values assigned therein. According to Mrs. Lockridge, she and the other shareholders entered into the Stock Redemption and Exchange Agreement as part of negotiations to obtain the approval of all shareholders of the Cattle Company to sell the New Mexico Ranch and to aid members of her family.  The values provided for the Pastures and stock in the Agreement reflect these dual objectives and by design had no bearing on the Debtors' understanding of the value of the New Mexico Ranch on the open market.  As such, when signing the 2009 Personal Financial Statement, the Debtors continued to believe that Mrs. Lockridge's interest in the New Mexico Ranch was worth $6,000,000.00.

22

As for Dr. Lockridge's misrepresentations to the Bank about his ability to pay the Loan based on real estate commissions, proceeds from the sale of the Aiken Road Farm, and proceeds from the sale of the New Mexico Ranch, the Court finds that Dr. Lockridge did not intend to deceive the Bank and avoid paying the debt owed to it.  Based on the evidence in the record and Dr. Lockridge's testimony, which the Court finds credible, it is the Court's opinion that these statements were merely hopeful promises by a Debtor seeking to save his property from foreclosure.

Dr. Lockridge believed, just as his wife, that the New Mexico Ranch would eventually sell for a price sufficient to pay their indebtedness.  Throughout 2009, potential buyers showed interest in the property despite no serious offers.  Dr. Lockridge also believed that he could sell the Aiken Road Farm.  He had an offer on the farm for approximately $5,000,000.00 in February 2008, immediately prior to financing his purchase with the Bank.  He also had an offer on the Farm in August 2009 for $3,465,000.00.  Both offers would have been sufficient to pay off the debt owed to the Bank.  He also still had potential buyers express interest in the farm in December 2009 and a written offer for $2,700,000.00 in the Spring of 2010.  Dr. Lockridge clearly had some reason to believe that he could sell the Aiken Road Farm and pay the debt and there is no evidence that this belief was otherwise.  Dr. Lockridge may have taken liberties and glossed over some of the finer points regarding the sale of these properties, but there is no evidence in the record that Dr. Lockridge made these representations with intent to defraud the Bank of the money due to it.  Dr. Lockridge believed he could bring the Loan current and/or pay off the Loan by these methods and his statements were clearly meant to buy himself time to do so.

The bottom line is that after considering all the circumstances surrounding this Loan relationship, the Court finds the Debtors' testimony credible and the Debtors' explanations sufficient to explain their behavior.  The Bank has failed to prove intent to deceive or that the

Debtors acted with such gross recklessness to support a finding of fraud.  Without such proof,

the Bank's claim pursuant to §523(a)(2)(A) and (B) must fail.  For this reason, the debt owed to

the Bank is dischargeable.

### Conclusion

The foregoing constitutes the Court's findings of fact and conclusions of law.  In reaching

the conclusions found herein, the Court has considered all of the evidence, exhibits, and

arguments of counsel, regardless of whether or not they are specifically referred to in this

decision.  A separate order shall be entered accordingly.


Copies To:

David Guarnieri, Esq.

Douglas Logsdon, Esq.

W. Thomas Bunch, Sr., Esq.

Matthew B. Bunch, Esq.

Mark Miller, Esq.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document*
*has been signed by the Judge and electronically entered by the Clerk in the*
*official record of this case.*



**Signed By:**
***Joseph M. Scott, Jr.***
**Bankruptcy Judge**
**Dated: Wednesday, May 30, 2012**
**(jms)**